REMINGTON TYPEWRITER CO. v. NOLAN.

(Circuit Court of Appeals, Third Circuit. May 6, 1918.)

No. 2329.

1. MALICIOUS PROSECUTION ⊜15—PROBABLE CAUSE—NECESSITY.

To sustain an action for malicious prosecution, plaintiff must establish that the defendant had no probable cause for instituting the prosecution independent of any question of malice.

2. MALICIOUS PROSECUTION ⊜71(2)—PROBABLE CAUSE—EVIDENCE—JURY QUESTION.

In an action for damages for malicious prosecution, evidence *held* insufficient to carry to the jury the question of want of probable cause, but to establish that defendant had probable cause for instituting the prosecution.

3. MALICIOUS PROSECUTION ⊜24(3)—WANT OF PROBABLE CAUSE—PRESUMPTION.

The mere fact that a criminal prosecution against plaintiff instituted by defendant was dismissed because of the failure of defendant, the prosecutor therein, to appear at trial, raises no presumption of want of probable cause which will relieve plaintiff of the burden of establishing want of probable cause in an action for malicious prosecution.

4. MALICIOUS PROSECUTION ⊜23—WANT OF PROBABLE CAUSE—MALICE.

Proof of malice, express or implied, actuating defendant's representative to institute a criminal prosecution against plaintiff, will not establish want of probable cause.

In Error to the District Court of the United States for the Middle District of Pennsylvania; Chas. B. Witmer, Judge.

Action by John Nolan against the Remington Typewriter Company. There was a judgment for plaintiff, and defendant brings error. Reversed and remanded.

Samuel B. Price, Cole B. Price, and John H. Price, all of Scranton Pa., for plaintiff in error.

David J. Reedy, John B. Jordan, E. A. De Laney, and Stanley F. Coar, all of Scranton, Pa., for defendant in error.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

BUFFINGTON, Circuit Judge. [1] In the court below one John Nolan, a citizen of Pennsylvania, brought suit against the Remington Typewriter Company, a corporate citizen of Delaware, for damages for malicious prosecution. On the trial the plaintiff recovered a verdict in a very substantial amount, and on entry of judgment thereon the defendant company sued out this writ. To sustain such an action for malicious prosecution, a plaintiff must establish that the defendant had no probable cause for such prosecution, for, if such probable cause existed, then, no matter what the motive which actuated the prosecution, no action can be maintained for instituting it. This fundamental proposition must be borne in mind, for while on the one hand the absence of probable cause may warrant an inference of malice, on the other the presence of malice will not warrant the in-

ference of probable cause. Thus in Stewart v. Sonneborn, 98 U. S. 194, 25 L. Ed. 116, Mr. Justice Strong, speaking for the court, said:

"The existence of a want of probable cause is, as we have seen, essential to every suit for a malicious prosecution. Both that and malice must concur. Malice, it is admitted, may be inferred from want of probable cause; but the want of that cannot be inferred from any degree of even express malice. Sutton v. Johnstone, 1 T. R. 493; Murray v. Long, 1 Wend. (N. Y.) 140; Wood v. Weir & Sayre, 5 B. Mon. (Ky.) 544."

[2, 3] Such being the law, it is apparent that, unless this record discloses an absence of probable cause in instituting this prosecution, the plaintiff cannot recover. Moreover, when the facts bearing on probable cause are not disputed, the question of the existence of probable cause is one for the court. Leaving aside therefore all disputed questions in this case, what undisputed facts were there bearing on probable cause for the institution of this suit? The proofs show these facts: The Remington Typewriter Company was and still is the owner of Monarch typewriter machine No. 3, serial No. 106,738. In pursuance of a written agreement dated March 9, 1914, this machine was on March 10, 1914, delivered, for Jaffe Bros., to Miss Nolan, their stenographer, at their office in Carbondale, on a lease at $10 per month. Miss Nolan was a daughter of the plaintiff. The machine was delivered subject to her approval, which being given, she paid $10 for Jaffe Bros. to W. J. Holden, the salesman of the typewriter company who had leased the machine. The testimony of Holden as to what followed was:

"Q. You put this machine in Jaffe Bros.' office, did you? A. Yes, sir.
"Q. You delivered it in Carbondale? A. Yes, sir.
"Q. Yourself? A. Yes, sir.
"The Court: On what date? A. It was on the 10th day of March, I believe, 1914, the day after the order was signed. It was signed on the 9th day of March, 1914, and I believe I delivered the machine the next day.
"Q. How were you paid for this machine, if at all? A. Why, I was supposed to be paid $10 on the delivery of the machine, and thereafter they were to pay $10 a month.
"Q. Did you receive $10 when you delivered the machine? A. No. Jaffe himself was not there when I delivered the machine, and I got it two or three days after that.
"Q. Who paid you that $10 you got a few days after that? A. If I recollect correctly, I think it was left in the office for me, and Miss Nolan gave it to me, when I called.
"Q. Who was Miss Nolan? A. She was the stenographer for Jaffe Bros.
"Q. How large an office did Jaffe have? A. Oh, one room. I should judge 15 to 20 feet, or something like that.
"Q. Was anybody present when you leased this machine? A. Only Miss Nolan, the stenographer.
"Q. She was in the room with you at the time? A. Yes; she had to say that the machine was all right before I got the order for it. * * *
"Q. Did you receive any other payment on that machine? A. No.
"The Court: Ten dollars is all you received? A. Ten dollars is all we received on the machine.
"Q. Did you ever go there and ask for it? A. Yes. * * *
"Q. Whom did you see in Jaffe Bros.' office on the visits subsequent to the time of the delivery of the machine? A. Miss Nolan.
"Q. Did you ever say anything to her— A. Every time I called there I talked to her in regards to it, and wanted to know when he would be in, and after I had called a number of times, and found from things I had heard and

seen around there with other people running around there after money that things looked rather shaky. * * * After I found these conditions, I asked Miss Nolan if she got her money regular, knowing that they were owing every one else, and she told me she got her money every Saturday, and I then asked her if she would get, the next time she saw Jaffe, to get the payment of $10 which was past due for the machine, and to keep it for me until I got back again; but before I got back again was the time I saw the item in the paper of the goods having been removed on Sunday night.

"Q. When did you see that? A. I believe it was on the 2d of June, in one of the Scranton papers.

"Q. In 1914? A. In 1914.

"Q. What did you—when you saw this—after seeing the article? A. I went to Carbondale on the next train after that."

The proofs show that, after seeing an item in the Scranton papers that Jaffe's goods had been removed on a Sunday night, Holden went to Carbondale, and there saw Dr. Stenson, a dentist who had an office in the building. The testimony in that regard is:

"Q. Did you make any inquiry as to the— A. And I went up to the building where the goods were taken from, and I saw Dr. Stenson.

"Q. Who is Dr. Stenson? A. He is a doctor or a dentist in the same building where Jaffe Bros. had their office, and found out what he knew about the goods being taken out.

"Q. Where is his office from Jaffe Bros.' office, the office occupied by Jaffe? A. I believe it is on the floor below Jaffe, on the second floor in the Aitken building.

"Q. Do you know where the Aitken building is in Carbondale? A. On the corner of Main street, but I could not tell you now the name of the cross street.

"Q. What is the Aitken building, as to whether an office building or what? A. The ground floor is taken up with offices outside of doctors.

"Q. What did Dr. Stenson tell you? A. He told me of hearing the commotion of them running up and down stairs just previous to midnight on this Sunday night, and he went out to investigate what the noise was, and found Lena Nolan and her brother and John Farrell, the drayman, removing furniture from Jaffe Bros.' office, and he went and notified Mr. Aitken, the proprietor, the owner of the building. * * * And he told me of notifying Mr. Aitken about it, and also told me that Mr. Aitken had come down immediately and went down towards Mr. Nolan's house after being informed by Dr. Stenson who was removing the goods, he went down there, and after that I went and seen Mr. Aitken. He told me what he had seen and found out down there.

"Q. What did he tell you? A. He told me that he went down there and met a couple standing across the street from Nolan's, and he asked them if they had seen anybody take furniture from a wagon to Nolan's house, and they said they had, and I believe they told him who the drayman was, or he found out in some way.

"Q. Did he tell you who the drayman was? A. He told me the drayman was a man named Farrell."

The personal knowledge of Stenson, who communicated what he knew to Aitken, the landlord, was as follows:

"Q. Where do you live? A. Carbondale.

"Q. Whereabouts do you live? A. In the Aitken block. I have an office and living apartments there.

"Q. You live in the Aitken building, also have living apartments there? A. Yes.

"Q. Do you remember the office of Jaffe Bros.? A. I do.

"Q. Where was that with regard to your office? A. Well, that was located on the third floor. I am on the second floor.

"Q. Was it over your office?   A. No, sir; in the other end, in what we call the new part of the building.

"Q. Do you remember when the goods were removed from Jaffe Bros.' office?   (Objected to.)

"Q. Do you remember any goods in the office of Jaffe Bros.?   A. Yes, sir.

"Q. Do you know when they were moved out?   A. Yes, sir.

"Q. When?   A. They were moved out on Sunday night, of May 31st.

"Q. On May 31, 1914, this was?   A. Yes, sir.

"Q. That was Sunday night?   A. That was Sunday night.

"Q. What time?   A. Twixt the hours of 11 and 12 o'clock.

"Q. At night?   A. Yes, sir.

"Q. Do you know who moved it?   A. Johnny Farrell was the drayman.

"Q. Who was with him?   A. I didn't see anybody with him.  There was the Nolan boys and Nolan girl there, and a lot of other people in there helping move out the—I could not say who.  All I know is when I heard them moving out I went up the street and notified Mr. Aitken." ·

The testimony of Aitken, the owner of the building, was:

"Q. Where do you live?   A. Carbondale.

"Q. How long have you lived there?   A. Sixty-odd years.

"Q. You are the owner of the building known as the Aitken block?   A. I am.

"Q. You were the landlord of Jaffe Bros.?   A. I am, or was.

"Q. Also have been since?   A. Yes.

"Q. On the evening of May 31, 1914, were you informed about the removal of any goods from that building?   A. I was.

"Q. About what time?   A. Midnight.

"Q. Who informed you?   A. Dr. Stenson did.   *   *   *

"Q. What did you do then?   A. Instead of following the dray, I went direct to Nolan's house.   *   *   *

"Q. Did you learn whether the dray had been there?   A. I did.

"Q. Did you learn where that dray had stopped?   A. I did.   *   *   *

"Q. When was your first conversation with Holden on this subject?   About when?   A. During that week some time.

· "Q. Now, go on and state just what you told Holden with reference to this subject.   A. I told what I had been told by the lallygaggers on the other side of the street, that the dray had backed up to Nolan's house, unloaded, and driven away just before I arrived there.   They told me that the drayman was—   *   *   *   I told Mr. Holden the facts as they came to me.  I followed the dray to the barn and caught the drayman as he was locking the door.  I said, 'Did you take any of the goods you swiped from my building into the barn?'  He said, 'No, everything was delivered at Nolan's.'  I told Holden I said to the drayman: 'You must be getting hard up to be stealing goods Sunday night that had been levied on.  It is liable to burn your fingers.  You must be hard up to be made a tool of a bank robber.'  He says, 'I didn't know, Mr. Aitken, that those goods weren't all settled for.  Nolans told me they had settled with you entirely or I would not have taken them.'  He wanted to talk more, and I told him I had nothing more to do with him, and I turned my back and went and swore out a search warrant for the goods that I had previously levied on.  I told Mr. Holden also the fact that the goods had all been taken from the building, probably $800 worth, and were undoubtedly at the house where they had been dumped.  Also, that I had notified the officer who had served the landlord's warrant that the goods upon which he had made a levy had been removed, and told him that I was about to or had issued a search warrant for their recovery.  I can't repeat all that I told Mr. Holden.  I told him the facts as they came to me.   *   *   *   I also told him that I intended—I think he asked me if I intended to recover the goods, and at that time I told him that I did."

In addition to this undisputed testimony as above quoted, there is, of course, much other testimony in the case which was disputed; but we confine ourselves to the undisputed information which came to

Holden's knowledge. That information was that the removal of the goods was of such a character as to appear in the newspapers and first attract Holden's attention. He went to Carbondale. He was told by Dr. Stenson, a professional man and a tenant in the building, that the goods had been taken away, not only at midnight, but on Sunday night. He learned that this removal at this hour had led Dr. Stenson to report the fact to Aitken, the owner of the building, and he learned from Aitken that all the goods had been removed, that he had seen the drayman who removed them, and had learned from him they had been delivered at Nolan's house; that he (Aitken) had held them on a landlord's warrant, and he was going to or had issued a search warrant for them; and that he intended to recover the goods. Stripped of all extraneous matters and confining our examination to this proof which was in no way controverted, and turning to the fundamental question of law, the existence of probable cause, which a court must decide in cases of this kind, there can be no question, under such proofs, not only had the plaintiff failed to show an absence of probable cause, but the uncontradicted testimony on the part of the defendant showed sufficient cause for the defendant's agent instituting a prosecution against Nolan to whose house the drayman had removed what he took from Jaffe's office. Holden's informants were men of affairs in the community. One of them, who considered himself wronged by the spiriting away of the goods which he held under a landlord's warrant, told him he either had or was going to sue out a search warrant. Under such circumstances, with such information coming from such sources, can there be any doubt of the duty of the trial judge to hold as a matter of law that the plaintiff had failed to show an absence of probable cause?

In the course the trial took, however, the trial judge did not decide this question of law, but left it to the jury to decide. This it did because of the fact that the prosecution Holden started finally resulted in a verdict of acquittal, the court ruling during the trial, "The case as it stands at the present time, by reason of the entering of a verdict, the burden is shifted and it is upon the defendant to show probable cause," and following that up in the charge where the jury were told:

"Prosecutions are presumed to have been properly instituted, and hence, to sustain an action for malicious prosecution, malice and want of probable cause must both concur and be proved by the plaintiff. The only case where the burden of proof is shifted is in the case of a verdict of acquittal. A verdict of acquittal is evidence of want of probable cause, though it may be slight; the effect to be given to such a verdict depends upon the circumstances upon which it was rendered, and you may take into consideration that it was by direction of the court, without submitting any evidence in determining the amount of weight to be given to the verdict of not guilty returned in this case."

Was the court right in thus, in effect, turning over the question of probable cause to the jury because there had been a verdict of acquittal? Without here discussing what would have been the effect had there been a verdict of acquittal, and if there had been a trial of the cause, the fact in this case was that when the case was called for trial Holden, the prosecutor and principal witness, failed to appear through

250 F.—44

a misunderstanding, and, in spite of the objection and request of the district attorney, the court refused to continue the case for trial and directed a verdict of acquittal without any witness being heard, or the prosecutor, Holden, being present. The question before us therefore is: Did such a directed verdict in the case against Nolan relieve him from showing probable cause in an action of false imprisonment? Under the authorities, clearly not. In 2 Greenleaf on Evidence, § 455, it is said:

"In ordinary cases it will not be sufficient to show that the plaintiff was acquitted of an indictment by reason of the nonappearance of the defendant."

This text-book summary has the support of adjudged cases. In Purcel v. McNamara, 1 Campbell, 199, 9 East, 361, an action for malicious prosecution, it appeared that after the indictment found was ready for trial the prosecutor (the defendant) was called and did not appear. Whereupon Lord Ellenborough, C. J., said:

"The question comes in fact to this, whether proving an acquittal for lack of prosecution be prima facie evidence of malice to support an action for a malicious prosecution; the contrary of which has been always held. The want of probable cause may indeed be so strong and plain as to amount to evidence of malice; but that must be shown by the plaintiff."

This same case was reported in 1 Campbell, 200, and Lord Ellenborough is there reported as saying:

"To hold, then, that because a prosecutor did not appear at the trial, no proof of the want of probable cause is requisite on the part of the plaintiff, amounts to this, that there is a presumption that everyone, against whom an indictment is found, is indicted without probable cause."

In the case of Roberts v. Bayles, 3 N. Y. Super. Ct. 49, the question involved was whether "the judgment of non pros. was of itself presumptive evidence of the want of probable cause." The court held it was not, saying:

"The effect of the ruling of the judge was to throw on the defendants the burthen of showing that there was probable cause, instead of throwing it upon the plaintiff to prove the want of probable cause. We think the learned judge, in holding non pros. to be prima facie evidence of the want of probable cause to institute the attachment proceedings, gave to it greater effect than it was entitled to; and that without something more, it did not make out the want of probable cause."

[4] From the proofs we have rehearsed it will sufficiently appear: First, that those facts which were not controverted showed there was probable cause for this prosecution; and, second, that the directed verdict of not guilty in the prosecution against Nolan without any trial on the merits, without any proof, and against the protest of the public prosecuting officer, and in the absence of the prosecutor, did not raise any presumption of lack of probable cause for such prosecution. It follows therefore that when the court below submitted such verdict to the jury as evidence of lack of probable cause, and relieved the plaintiff from proof of want of probable cause, it fell into error. Moreover, additional proof of lack of probable cause the plaintiff did not give. He attempted to do so by adducing proof of malice on the part of the defendant's salesman, Holden, who had instituted the pros-

ecution. But we have been unable to gather from the proofs any evidence of malice or ill will on Holden's part. It is true he was persistent, but his persistence was, as far as the proof goes, evidenced by an earnest effort to follow up the stolen machine which from the information given him had gone to the plaintiff's house at midnight and which has never yet been found. But assuming for present purposes that malice and ill will on the part of Holden toward the plaintiff were proven, such malice neither proved lack of probable cause in the prosecution, nor did such malice, if proved, relieve the plaintiff from proving lack of probable cause. The prosecutor often may have ill will, or even malice, against a defendant; but such ill will or malice in no way affect the question of lack of presence of probable cause. For as we have seen before in Stewart v. Sonneborn, 98 U. S. 194, 25 L. Ed. 116:

"Malice, it is admitted, may be inferred by the jury from want of probable cause; but the want of that cannot be inferred from any degree of even express malice."

The rule thus stated by the Supreme Court of the United States is generally held by the state cases, an example of which is King v. Colvin, 11 R. I. 584, where the Supreme Court of that state said:

"Since the law presumes that every prosecution is undertaken from proper motives, and for sufficient reasons, the plaintiff in an action of malicious prosecution must prove both malice and want of probable cause. It is not enough for him to prove that the prosecution was malicious, unless he also shows it to have been without probable cause; and, though malice may be inferred from the want of probable cause, the converse of that proposition is not true."

It will thus be seen that all evidence of alleged malice was of no moment in this cause unless the plaintiff by proper evidence showed a lack of probable cause. Not only did Nolan fail to produce such evidence, but the proof of the defendant—in that regard uncontradicted —was that there was probable cause for this prosecution. Such being the case, the plaintiff having failed to show lack of probable cause, the question of the prosecutor's ill will or malice was not decisive or evidential, and the court should have approved the defendant's request for binding instructions on the ground that the plaintiff had not shown a lack of probable cause for the prosecution of Nolan.

The case is therefore reversed, and the record remanded to the court below for further proceedings.